IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: S.S. BODY ARMOR I, INC., *et al.*, | : | Chapter 11 |
| Debtors. | : | Bankr. Case No. 10-11255 (CSS) |
| CARTER LEDYARD & MILBURN, LLP, | : | (Jointly Administered) |
| Appellant, | : | Civ. No. 18-634-GMS |
| v. | : | |
| S.S. BODY ARMOR I, INC., | : | |
| Appellee. | : | |

## ORDER

WHEREAS, on April 14, 2010, SS Body Armor I, Inc., together with certain affiliates ("Debtors"), filed voluntary petitions for relief (B.D.I. 1)[1] under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware ("Bankruptcy Court");

WHEREAS, prior to the Petition Date, Debtor's former CEO David Brooks was indicted in the Eastern District of New York in connection with a massive insider trading scheme;

WHEREAS, prior to the Petition Date, from 2007 through 2010, shareholder D. David Cohen ("Cohen") and appellant law firm Carter Ledyard & Milburn LLP ("CLM") together bore the expense of objecting to and successfully appealing the combined settlement of class action and shareholder derivative lawsuits involving the Debtors; absent Cohen and CLM's efforts and successful appeal, that settlement would have otherwise released and indemnified Brooks from liability under § 304 of the Sarbanes-Oxley Act, 15 U.S.C. § 7243(a) ("SOX 304");[2]

WHEREAS, in 2010, the U.S. Attorney's Office in the Eastern District of New York ("USAO-

---

[1] The docket of the chapter 11 cases, captioned *In re S.S. Body Armor I, Inc., et al.*, Case No. 10-11255 (CSS) (Bankr. D. Del.), is cited herein as "B.D.I. __."

[2] *See Cohen v. Viray*, 622 F.3d 188, 193, 195 (2d Cir. 2010).

EDNY") commenced a civil forfeiture proceeding ("Civil Forfeiture Proceeding") against a multitude of Brooks-related assets, pursuant to which, Debtor asserts, approximately $168 million of assets are currently restrained (*see* D.I. 11 at 2);[3]

WHEREAS, on November 10, 2015, the Debtors confirmed a plan of liquidation, which established a recovery trust ("Recovery Trust") to pursue estate claims (B.D.I. 3526) ("Plan");

WHEREAS, on December 3, 2015, the Bankruptcy Court ruled that CLM and Cohen were entitled to a fee award for their efforts in preserving the SOX 304 claim, to be paid only from funds which the Debtors or their successors-in-interest receive on account of the SOX 304 Claim, if any, in an amount to be determined by the Bankruptcy Court (B.D.I. 3624) ("Fee Order");

WHEREAS, Appellants have appealed the Fee Order on the basis that, *inter alia*, the Bankruptcy Court applied the wrong legal standard in making payment of the fee award contingent upon a recovery by the Debtor on account of the SOX 304 claim, and that appeal remains pending;[4]

WHEREAS, in October of 2016, Brooks died in prison while his appeals of his criminal convictions[5] were pending in the Second Circuit, and, as a result, those convictions as well as all restitution awards, fines, and orders of forfeiture were vacated under the doctrine of abatement;[6]

---

[3] The Debtor and the Class Plaintiffs (defined below) each submitted petitions for remission to the DOJ requesting that the Attorney General use the restrained assets to compensate for the losses suffered as a result of Brooks' misconduct. Pursuant to 18 U.S.C. § 981, the Attorney General has authority to use assets forfeited in a civil forfeiture proceeding to compensate victims. *See* 18 U.S.C. § 981(d).

[4] *Cohen v. SS Body Armor I, Inc.*, Civ. No. 15-1154 (GMS) ("Fee Appeal"), D.I. 19. The Fee Appeal was stayed by agreement of the parties until April 20, 2018, along with Cohen's appeal of an order approving the settlement agreement underlying the Plan. *See Cohen v. SS Body Armor I, Inc.*, Civ. No. 15-633 (GMS) ("Settlement Appeal"). By order dated May 3, 2018, the court lifted the stay in both the Fee Appeal and the Settlement Appeal.

[5] In 2010, Brooks was convicted by a jury of (among other things) securities fraud, wire fraud, insider trading, and material misrepresentations to auditors. Brooks was sentenced to 17 years imprisonment in 2013. Following Brooks' criminal conviction, the E.D.N.Y. entered a $65 million order of forfeiture against Brooks' assets, a fine of $8.7 million, and criminal restitution awards of $53.9 million in favor of the Debtor and $37.6 million in favor of individual victims (mostly shareholders of the class). (*See* D.I 5 at 6).

[6] *U.S. v. Brooks*, 872 F.3d 78 (2d Cir. 2017).

WHEREAS, following Brooks' death, various parties[7] entered into a term sheet for a possible global settlement of multiple claims and causes of action, involving multiple parties and litigation in multiple venues,[8] which has not yet been approved or finalized by the parties, but which the Debtor anticipates will be finalized and funded by July 20, 2018;[9]

WHEREAS, upon learning of the potential global settlement, on January 17, 2018, appellant filed a motion (B.D.I. 4019) requesting that the Bankruptcy Court require the Debtor to establish a $25 million reserve to pay the fee award ("Fee Reserve Motion"),[10] which was heard (B.D.I. 4046) and granted, in part, on February 16, 2018 (B.D.I. 4100) ("Reserve Order"), with the Bankruptcy

---

[7] Parties include the Debtor; the Recovery Trust established under the Debtor's chapter 11 Plan; plaintiffs in a pre-petition class action filed on behalf of the shareholder victims of Brooks' securities fraud ("Class Plaintiffs"); the Department of Justice ("DOJ"); the Securities and Exchange Commission ("SEC"); the Brooks estate; and Brooks family members asserting claims to approximately $92.7 million of the restrained assets. (*See* Civ. No. 15-1154, D.I. 52 at 2 (status report dated April 20, 2018); D.I. 11 at 6)). Debtor asserts that the SEC will not be a party to the global settlement. (*See* D.I. 11 at 7).

[8] Litigation includes, *inter alia*, the Civil Forfeiture Proceeding; and the Securities and Exchange Commission's ("SEC") civil enforcement action ("SEC Action") pending in the Southern District of Florida, captioned *SEC v. Brooks*, Case No. 07-civ-61526 (S.D. Fla.).

[9] According to the status report filed by the Debtor on April 20, 2018 in the related appeal of the Fee Order, "the Debtor currently anticipates that the global settlement will be finalized and funded within the next 2-3 months." (*See* Fee Appeal, D.I. 52 at 2). The parties dispute the amount of the recovery to the Debtor in the global settlement (if finalized and approved). According to Debtor, the global settlement contemplates the forfeiture and payment of the approximately $142 million of restrained assets to the Debtor, the Class Plaintiffs, and other qualifying victims on account of their respective Petitions for Remission submitted to the DOJ. (D.I. 11 at 3). "[T]he $142 million of restrained assets will be distributed by the DOJ among the Debtor, Class Plaintiffs and other qualifying victims, with an anticipated recovery of $70 million by the Debtor." (*Id.* at 4; *see also* 4/24/18 Hr'g. Tr. at 20:14-21:13). Appellant argues that Debtor will receive $142 million, as described in a status report filed in the SEC Action, by virtue of the global settlement. (D.I. 5 at 2-3).

The parties further dispute what portion, if any, of the Debtor's recovery under the global settlement (if finalized and approved) would be "on account of" the SOX 304 claim. Appellant appears to argue that the entire recovery is on account of the SOX 304 claim because those assets would be unavailable for distribution but for appellant's efforts in objecting to Brooks' indemnification and release. Debtor argues the source of the recovery is not the SOX 304 claim but rather the assets that have been restrained by the U.S. government since 2006. (*See* D.I. 11 at 9; 4/24/18 Hr'g Tr. at 18:6-20:13). Debtor contends "the settlement funds that will be paid to Debtor will be derived wholly from the assets restrained in the Civil Forfeiture Proceeding, not from any funds attributable to the SOX 304 claim" (*id.* at 10), and that, "at best, the existence of the SOX 304 claim may have provided some additional 'leverage' in the negotiation of the global settlement" (*id.* at 4).

[10] Appellant argued that a fee reserve was necessary to ensure that adequate funds are available to satisfy the fee award, if any, as the post-confirmation Debtor and Recovery Trust are authorized to make distributions to creditors without further order of the Bankruptcy Court. The basis for the Fee Reserve Motion was appellant's justified concern that that settlement proceeds received under the global settlement, if finalized, may be distributed to creditors immediately without reserving an adequate amount to pay the fee award. (*See* B.D.I. 4019 at 2-3).

3

Court ordering the Debtor to establish $5 million reserve;[11]

WHEREAS, on March 27, 2018, appellant filed with the Bankruptcy Court a motion for stay pending appeal (B.D.I. 4059), which was heard (B.D.I. 4110) and denied by the Bankruptcy Court on April 24, 2018 (B.D.I. 4100);[12]

WHEREAS, on April 25, 2018, appellant filed its notice of appeal (D.I. 1), and contemporaneously therewith, an emergency motion for stay pending appeal (D.I. 5) ("Emergency Stay Motion") and a motion for expedited consideration (D.I. 6) ("Motion to Expedite");

WHEREAS, on May 16, 2018, the court granted the Motion to Expedite and set an expedited briefing schedule with respect to the Emergency Stay Motion (D.I. 10);

WHEREAS the Emergency Stay Motion has been fully briefed (D.I. 5, 11, 12, 13) and is presently before the court;

WHEREAS, the court has considered the parties' briefing and the applicable law;

IT IS HEREBY ORDERED THAT:

Appellant's Emergency Stay Motion (D.I 5) is **DENIED**.[13]

---

[11] In reaching its determination to set a reserve, the Bankruptcy Court considered: the attorneys' fees incurred; the (disputed) size of the settlement; the $70 million recovery by the Debtor evidenced by the term sheet; and a fee reserve amount in terms of "percentage." (2/16/18 Hr'g. Tr. at 53:2-7). Based on those considerations, the Bankruptcy Court determined that $5 million was an appropriate reserve. (*Id.* at 53:8-13). With respect to the reserve amount, the Bankruptcy Court stressed "it's not a cap, it's not a minimum, it's a reserve." (*Id.* at 54:7-8).

[12] Appellant argued that $5 million is an insufficient reserve and sought a stay of any distribution pending its appeal of the Reserve Order. The Bankruptcy Court denied the stay, finding that the Reserve Order "sufficiently and adequately made a reservation of $5 million previously to cover the claims of [CLM] and Mr. Cohen." (4/24/18 Hr'g. Tr. at 36:3-6). The Bankruptcy Court stated "the reality is we are in bankruptcy, we're talking about a claim, and a [lode]star on a claim of two to three X is extraordinary, certainly let alone nine X." (*Id.* at 36:11-14). The Bankruptcy Court found "a very low likelihood of receiving a fee award in excess of $5 million" and denied the stay. (*Id.* at 37:10-13). In balancing the stay factors, the Bankruptcy Court noted the serious consideration given to the risk of irreparable harm; specifically that, if all funds are distributed, there will not be any funds to pay an award in excess of $5 million. (*Id.* at 37:18-25). However, the Bankruptcy Court considered the "extremely low, if not non-existent likelihood of success on the merits balances that out." (*Id.*)

[13] "The granting of a motion for stay pending appeal is discretionary with the court." *See In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *2-3 (Bankr. D. Del. Mar. 27, 2001). Appellant bears the burden of proving that a stay of distributions is warranted based on the following criteria: (1) whether appellant has made "a strong showing" that it is likely to succeed on the merits; (2) whether appellant will be irreparably injured absent a stay; (3) whether a stay will substantially injure other interested parties; and (4) where the public interest lies. *Republic of Phil. v. Westinghouse Electric Corp.*, 949 F.2d 653, 658 (3d Cir. 1991). The most critical factors, according to the Supreme Court, are the first

4

two: whether the appellant has demonstrated (1) a strong showing of the likelihood of success, and (2) that it will suffer irreparable harm – the latter referring to harm that cannot be prevented or fully rectified by a successful appeal. *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015) (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009) (internal citations omitted)). The court's analysis should proceed as follows:

> Did the applicant make a sufficient showing that (a) it can win on the merits (significantly better than negligible but not greater than 50%) *and* (b) will suffer irreparable harm absent a stay? If it has, we balance the relative harms considering all four factors using a 'sliding scale' approach. However, if the movant does not make the requisite showings on either of these first two factors, the inquiry into the balance of harms and the public interest is unnecessary, and the stay should be denied without further analysis.

*Revel AC*, 802 F.3d at 571 (emphasis in text) (internal quotations and citations omitted).

*Irreparable harm.* With respect to irreparable harm to appellant if distributions are not stayed, the Bankruptcy Court has already determined that a fee reserve is appropriate to protect appellant's interests. (*See* 2/16/18 Hr'g. Tr. at 50:19-51:5 ("I think it's rather obvious that a fee reserve has to be set here. I have full belief that whatever comes into the estate will be distributed to the appropriate parties as quickly as possible. People have waited a long time for this money and the fiduciaries in charge of that money are going to want to move it along. And I do believe that absent a Court order requiring a reserve all the assets will be disbursed and [appellant] will be left with no ability to receive a fee because there'll be no money left to chase. So I think it's completely appropriate to set a fee reserve.")) The court agrees. However, the irreparable harm that appellant was facing was addressed and alleviated to some degree by the Reserve Order it now appeals. The stay motions represent a second and third bite at the apple. In light of the existing $5 million reserve – which is nine times the amount of documented fees incurred by CLM in connection with the SOX 304 claim – this factor is neutral.

*Likelihood of success on the merits.* Appellant has not made a "strong showing" that the court is likely to find a $25 million fee reserve is appropriate. "The standards employed in calculating attorneys' fees awards are legal questions subject to plenary review, but the amount of a fee award is within the district court's discretion so long as it employs correct standards and procedures and makes findings of fact not clearly erroneous." *In re Rite Aid Corp. Securities Litig.*, 396 F.3d 294 (2005) (internal quotations and citations omitted); *see also Krueger Assocs., Inc. v. Am. Dist. Telegraph Co. of Penn.*, 247 F.3d 61, 69 (3d Cir. 2001) (bankruptcy court's fee award is reviewed for abuse of discretion); *Zolfo, Cooper & Co. v. Sunbeam-Oster Co.*, 50 F.3d 253, 257 (3d Cir. 1995) (same). The Third Circuit has held that the proper method of analyzing a fee award in a "common fund" case is the percentage-of-recovery method. *See Rite Aid*, 396 F.3d at 306. When analyzing a fee award in a common fund case, the court should consider seven factors: (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases. *Rite Aid*, 396 F.3d at 301. In such cases, a cross-check using the lodestar method, which uses the number of hours reasonably expended as its starting point, is appropriate. *See id.* at 300. The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting, and courts may rely on summaries submitted by the attorneys and need not review actual billing records. *Id.* at 306.

Appellant argues there is a likelihood that a fee in excess of $5 million may be awarded. (D.I. 5 at 3). Appellant argues the $142 million of assets constitute a "common fund" attributable to the preserved SOX 304 claim; that the Third Circuit requires application of the percentage-of-recovery method in common fund cases; that the Bankruptcy Court failed to apply the factors outlined above; and that the facts of this case satisfy the factors and provide ample support for a percentage award of greater than $5 million. (*Id.* at 16-17). According to appellant, "[c]ourts often grant fee awards to objectors totaling between 10-25% (and up to 34%) of the benefit conferred." (*Id.* at 15). Conversely, Debtor argues that appellant's position mischaracterizes the amount of the global settlement and that "common fund" analysis does not apply. (D.I. 11 at 9-11). Debtor argues that the "common fund" doctrine authorizes a fee award only when an individual (or his counsel) has caused the creation of the common fund, or prevented its diminution, and the moving party must be able to show the price amount of the fund, or portion of the fund, that the party created or preserved. (*Id.* at 10). Debtor argues that appellant "did not create the 'common fund' (*i.e.*, the portion of the restrained assets to be received by the Debtor) or perform any work to establish or preserve the Debtor's claims or rights to the restrained assets. (*Id.*) "[A]t best, CLM performed work that helped to preserve one of the other claims 'on the table' during the negotiation of the global settlement" – which was just one of fourteen claims in the SEC Action. (*Id.* at 12-13). Debtor argues that "the settlement funds that will be paid to the Debtor will be derived wholly from the assets that have been restrained in the Civil Forfeiture Proceeding" since 2006. (*Id.* at 10). "At most, CLM could be entitled to an allocation correlating to its contribution to the SOX 304 claim, and any extra leverage the SOX 304 claim ... added to the negotiation of the global settlement, if the monetary value of that tangential contribution was amenable to the type of precise calculation required under the percentage of recovery method – but it is not." (*Id.* at 13). Debtor further argues that assuming a fee is awarded, the

Dated: June 29, 2018

UNITED STATES DISTRICT JUDGE

---

lodestar method is the appropriate method where, as here, "the nature of the settlement evades the precise evaluation needed for the percentage of recovery method." (*Id.* at 11 (quoting *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 820-21 (3d Cir. 1995) (court "may select the lodestar method ... where it can calculate the relevant parameters (hours expended and hourly rate) more easily than it can determine a suitable percentage to award")). According to Debtor, any fee award should be calculated using the lodestar method based on CLM's actual fees of $549,472.61 incurred in connection with preserving the SOX 304 claim, with either no multiplier or a multiplier that does not exceed the 3.38 multiplier espoused in appellant's previously filed fee application (B.D.I. 3300 at ¶ 107), resulting in a maximum fee of $1.86 million. (*Id.* at 8 & 15).

As stated by the Bankruptcy Court, several disputed issues, which were not before the Bankruptcy Court at the time, will bear on the Bankruptcy Court's ultimate calculation and award of fees, and those issues include at least the following: (i) whether the assets, which have been restrained in the Civil Forfeiture Proceeding since 2006, are a "common fund" attributable to appellant's efforts (2/16/18 Hr'g. Tr. at 49:15-21); (ii) what amount Debtor's estate will actually receive under the terms of the global settlement (*id.* at 51:6-52:17); and (iii) of the funds received by the Debtor in the global settlement, what amount, if any, will be recovered "on account of" the preserved SOX 304 claim (*id.* at 50:2-11). In light of these disputed issues, the court cannot find that the Bankruptcy Court applied an incorrect standard or abused its discretion. In reaching its determination to set a reserve, the Bankruptcy Court indicated that it had considered the attorney's fees incurred; the (disputed) size of the settlement; assumed a $70 million recovery (as evidenced by the term sheet); and considered a fee reserve in terms of "percentage." (*Id.* at 53:2-13). Based on these considerations, the Bankruptcy Court determined that an appropriate reserve was $5 million. (*Id.*) The decision reflects that, in setting the reserve, the Bankruptcy Court considered a percentage recovery (Tr. at 53:2-7), but, in light of the open factual issues – which the parties conceded would require further discovery and which certainly could not be resolved where no final settlement is even in place – the Bankruptcy Court, in its discretion, set a $5 million reserve.

Appellant has offered no concrete justification for the $25 million amount. While the amount of the anticipated recovery is disputed, a $25 million fee award would amount to approximately 35% of the Debtor's anticipated recovery of $70 million under the global settlement. Looking to the hours CLM incurred in connection with the SOX 304 claim, a $25 million fee award would reflect a lodestar multiplier of 45.4, and an hourly rate of $16,642.26. Here, a lodestar cross-check of the $5 million reserve set by the Bankruptcy Court would reflect a multiplier of nine times the $549,472.61 of documented fees. (*See* 4/24/18 Hr'g. Tr. at 36:7-14). The court cannot find that such a reserve constitutes an abuse of discretion. For the foregoing reasons, the court does not find a probability of success on appeal with respect to the Bankruptcy Court's methodology under Third Circuit law, or with the amount of the reserve ultimately set by the Bankruptcy Court – determined in advance of any final settlement among the parties and in absence of critical facts – which, under the circumstances of this case, was necessarily an exercise of discretion.

***Other factors.*** Having evaluated appellant's likelihood of success on the merits and irreparable injury absent a stay, and having determined that appellant has failed to carry its burden as to either element, the court is satisfied no further analysis is required. Thus, the court finds that appellant has not satisfied its burden necessary to justify a stay pending appeal. *See Revel AC*, 802 F.3d at 571 ("If the movant does not make the requisite showings on either of these first two factors, the inquiry into the balance of harms and the public interest is unnecessary, and the stay should be denied without further analysis.") For the foregoing reasons, the court will deny the Emergency Stay Motion.